# THE SUPREME COURT

### OF THE

## STATE OF NEVADA.

## JULY TERM, 1879.

---

[No. 898.]

## E. S. DAVIS, RECEIVER OF THE FIRST NATIONAL BANK, APPELLANT, *v.* LEWIS COOK ET AL., RESPONDENTS.

PARTNERSHIP—PROMISSORY NOTES—PRESUMPTION.—Where the notes are given in the firm name the legal presumption is, that they were executed for a partnership purpose, and the burden of proof is upon defendants to establish the contrary.

IDEM—POSSESSION OF PERSONAL PROPERTY—VERITY OF DEED—INSTRUCTION.—The following instruction, viz: "Possession of personal property is *prima facie* evidence of ownership, and a deed on its face imports verity, and no subsequent change of possession shows, or tends to show, that a party in possession first was not the owner at that time:" *Held,* erroneous.

REAL ESTATE—PURCHASE OF BY ONE PARTNER.—The purchase of real estate may or may not be within the scope of the partnership business.

IDEM—SCOPE OF PARTNERSHIP BUSINESS.—Lewis, John A. and Isaac Cook were co-partners engaged in the business of general merchandising, under the firm name of "Cook Bros." Lewis, was the resident partner. John A. and Isaac were non-residents. Lewis Cook purchased a stone storehouse and a lot of stationery, in his individual name, and in payment therefor gave the notes, sued upon in this action, in the firm name: *Held,* in reviewing all the testimony, that Lewis Cook in making this purchase acted within the scope of the partnership business, and that the knowledge of such purchase was not sufficient to put the plaintiff upon inquiry as to the consent of the other partners.

ASSUMPTION OF FACTS NOT PROVEN.—A question which assumes a fact not proven in the case ought not to be asked.

Appeal from the District Court of the Ninth Judicial District, Elko County.

The question referred to in the fifth assignment mentioned in the opinion as immaterial, propounded to John A. Cook, was as follows: Question—"Prior to July, 1869, did you ever have any knowledge or ever consent to the establishment of any business at Hamilton, by Cook Bros., or Lewis Cook, in the firm name?"

The question propounded to J. Barnett, and referred to in the opinion as the ninth assignment, was as follows: Question—"At the time John A. Cook settled Cook Bros. indebtedness with the First National Bank, at Hamilton, Nevada, who had the immediate control and supervision of that business for E. S. Davis, Receiver of the First National Bank?"

The following are the instructions referred to in the opinion of the court.

Instruction number seven asked by the plaintiff and refused:

"The plaintiff asks the court to instruct the jury, that Harker at the time these notes were given had the right to presume that the business of Cook Bros., at Hamilton, had been established, if at all, by the firm, and that unless he knew that it had not been, or had notice sufficient to put him upon inquiry that it had not been so established, then the right of the plaintiff to recover is not affected by the question as to whether Lewis Cook opened business in Hamilton with or without the consent of his partners."

The ninth instruction asked by plaintiff and refused:

"The jury are instructed that if they believe from the evidence that Lewis Cook opened a store in Hamilton, Nevada, under the firm name of Cook Bros., and that the other members of the firm were apprised of the fact, and never objected thereto, then in contemplation of law this was an adoption and ratification by John A. and Isaac Cook, and they cannot now be heard to say that such business was carried on without their consent or authority."

The second instruction asked by defendant and given by

the court reads as follows: "You are instructed that if the transaction which was the consideration of the notes sued upon was outside of the business of the firm of Cook Bros., then the bank was not entitled to actual notice that the transaction was in the name of and for the individual benefit of Lewis Cook."

The other facts are set out at length in the opinion.

*Kenney & Rand,* for Appellant.

I. The court erred in overruling the objections to the question propounded John A. Cook, mentioned in the fifth assignment. The testimony was irrelevant.

The law presumes that when one member of a mercantile firm gives the notes of the firm, he is acting for the firm, and within the scope of the partnership business. (1 Parsons on Notes and Bills, 123, 128; Story on Prom. Notes, sec. 92; 18 Am. Rep. 192; 11 Mich. 525.)

Not having pleaded the want of authority they should not have been permitted to prove it. (10 Cal. 331; 39 Id. 532; 29 Barb. 170; 1 Greenl. on Ev., sec. 448.)

The presumption of law being admitted, so far as this case is concerned, he had the authority. (1 Parsons on N. & B. 123; 11 Nev. 200; 5 Cowen, 688.)

There was no offer to prove that the bank had any knowledge of the want of authority, and the law presumes that he had such authority. When a party offers to prove a fact, which standing by itself is irrelevant, and it is objected to as irrelevant, the party offering such proof should undertake to show such facts as would make it relevant, otherwise the proof should be rejected. (12 Cal. 426; 1 Greenl. on Ev., sec. 51.)

II. There was no evidence to identify the deed offered in evidence with the property purchased in the transaction in which these notes were given, and none that the bank had any knowledge that the deed was made to Lewis Cook alone. The record of the deed was not notice to the bank. (6 Cal. 720; 20 Id. 515.)

III. The receiver's powers were of a restricted and limited character. He could not admit away the rights of the

creditors. (Morse on Banking, 516, sec. 50; General Banking Laws of the United States, approved June 3, 1864; Paley on Agency, 174-75-76, and notes thereto; Story on Agency, secs. 13 and 14; 26 Wend. 485.)

IV. There was a material fact assumed in the ninth assignment of which there was no proof, and no offers to prove. It was an attempt to controvert by evidence facts admitted in the answers. (1 Greenl. on Ev. 434; 10 Md. 76; 1 Whart. on Ev. 504; 20 Ill. 170; 27 Cal. 418.)

Davis could not ratify the acts of McCornick in attempting to defraud the creditors of the bank, and even if he could, he should have had something more than an opportunity of knowing what was done. He should have had actual notice of what was done.

The fourteenth assignment was clearly error. Hilp had been examined in chief as to the same subject-matter, and the plaintiff had a right to cross-examine him in relation to everything to which he had been examined in chief. (1 Wharton on Ev. 530; 7 Nev. 385.)

V. Plaintiff had a right to show that the merchandise, which was a part of the consideration for which these notes were executed, was appropriated and used by the firm of Cook Bros., with the knowledge and consent of the other members of the firm, and also to show a ratification of the purchase of the goods. (12 Pick. 430; 31 Mich. 373.)

The plaintiff had a right to show that the building, which was a part of the consideration for which the notes were given, was used by the firm for partnership purposes with the knowledge and consent of John A. and Isaac Cook. (Pars. on Partner. 376-77-78-79; 1 Pars. on N. & B. 124; 14 Wendell, 133; 1 Sumner, 183.)

VI. The court erred in refusing the seventh instruction asked by plaintiff. Lewis Cook told Harker that the firm had opened business in Hamilton, and the partnership is admitted. (Pars. on Part. 20, 180-197; note top 209; 2 Pars. on N. & B. 481; Story on Part. sec. 108-109; 6 Allen, 317.)

The court erred in refusing the ninth instruction asked by the plaintiff. There was ample evidence to sustain the in-

struction or to entitle the jury to pass upon it. (Story on Agency, secs. 253, 256, 258.)

VII.   The court erred in giving the first instruction asked by defendant.   It ignores the fact that it was just as necessary that the bank should have notice or sufficient reason to suppose to put it upon inquiry, that Lewis Cook was acting outside of the business of the copartnership as that he should be so acting. (1 Pars. on N. & B. top 128, 132, 133; 16 Wend. 505; 11 Johns. 544; 2 Pa. 160; 5 Blackf. 210; 20 How. U. S. Sup. Ct. 343.)

A *bona fide* holder of commercial paper is the person who owns the paper and has taken it in good faith for a valuable consideration.

He may be the payee, the indorsee or the bearer. (Story on Prom. Notes, secs. 195, 196; Pars. on N. & B. 253, 254.)

When errors are committed the law presumes injury. (39 Cal. 609; 42 Id. 402.)

VIII.   The deed from Ivers to Lewis Cook is only *prima facie* evidence that the bank had any knowledge that it was given to Lewis Cook individually. (Pars. on Part. 376–77–79; note to 378; 5 Metcalf, 582; 9 Cal. 639; 9 Nev. 134, 1 Sumner, 182.)

IX.   The acts of Lewis Cook were but the reasonable acts of the managing partner of a mercantile firm in this state. (Story on Part. note to top p. 244; Pars. on N. & B. 123; 12 Pick. 545; 44 N. Y. 514; 44 Id. 680; 9 Wall, 546; 20 How. 343; 6 Allen, 317; 17 Wend. 47; 5 Id. 223.)

*A. M. Hillhouse,* for Respondents.

I.   The fact that the notes were given in lieu of indebtedness of Brachman & Ivers to the bank, shows that the transaction was  simply  that of a partner *assuming* an indebtedness of others for his firm.

This was not within the power of a partner.

U. S. Digest, N. S., vol. 9, p. 841, secs. 530–1–2–3, and authorities there cited.

II.   Harker, the president of the bank, knew Lewis Cook was purchasing real estate and an entire stock of books, stationery, etc., both of which were outside of the business

of "general merchandise." (6 Moak's notes Eng. Rep. 292; 43 Cal.)

III. A third party dealing with a partner must—when he knows the character of the transaction—know at his peril whether the business is within the legitimate scope of partnership business. (8 Ves. 540; 4 Johns. 266; 6 Id. 38; 19 Id. 156.)

A partner cannot establish a new firm or new business. (20 Ind. 110; 7 Barb. 150; 18 Wend. 477; 14 Id. 141; 3 Id. 415; 10 Id. 461.)

The business in which a partnership note is given must be within the scope of the partnership. (12 Gray, 453; 13 Id. 467; Story on Part. 132, 133; Collyer on Part. p. 188, sec. 139, p. 475 *et seq.*; Story on Ag., secs. 125, 137; 1 Am. Rep. 440; 8 Id. 576; 9 U. S. Dig. 439, 493.)

IV. Plaintiff stood in chief upon original authority and anticipated defendants' case. Defendants only controverted that. No proof of ratification was proper in rebuttal. (4 Gray's Mass. 215; 2 Id. 282; 6 Id. 507.)

There can be no ratification without full knowledge of all the material facts in relation to the act sought to be enforced. (3 Johns. Ch. 188; Storey's Agency, sec. 239, p. 298; *Adams Express Co.* v. *Trego,* 35 Md. 47; 12 Allen Mass. 493; 5 Nev. 224.)

V. Under all the evidence in the case the verdict and judgment are so manifestly correct that, even if there were some errors, the order and judgment appealed from should be affirmed. (See Graham and Waterman on New Trials, vol. 3, pp. 817, 864–868, and authorities there cited.)

By the Court, Leonard, J.:

There have been several trials, and one appeal, of this case, before the present one. (9 Nev. 134.) At the last trial defendants recovered judgment for their costs. Plaintiff's motion for a new trial was denied, and this appeal is taken from the order overruling that motion. The notes sued on were dated at Hamilton, Nevada—the first, June 23, 1869, the second, June 30, 1869, and were signed "Cook Bros." Defendant Lewis Cook was not served with summons, and

in no manner appears or answers.   John A. and Isaac appear and answer for themselves alone.

It is alleged in the complaint, and is not denied in the answer, that the three defendants, at the time the notes were made, were partners doing business under the firm-name and style of "Cook Bros."

It is also alleged that on the days above stated, defendants, for value, made and delivered said notes to the First National Bank of Nevada; that no part of the same has been paid, and that plaintiff, as the duly appointed and authorized receiver of said bank, is the lawful holder and owner thereof.   Defendants John A. and Isaac do not allege want of authority in Lewis to execute the notes in the name of the firm as he did; nor is there any denial that the bank gave a valuable consideration therefor.   There is no denial that the defendants executed them in the firm name, except by an allegation that they were given for the individual indebtedness of Lewis, for goods and real estate purchased by him of Bruckman & Ivers and W. D. Ivers, for his individual use and benefit, and not for the firm, with knowledge of such facts on the part of the bank, through its officers and agents, who colluded and conspired with Lewis to defraud the other defendants, and that the firm received no part of the consideration of the notes.   Defendants John A. and Isaac also allege that at the time of the purchase of said property of Bruckman & Ivers and W. D. Ivers, the latter were indebted to the bank to the extent of the notes in question, and that in part payment of the purchase money Lewis assumed their indebtedness to the bank, and the bank took Lewis therefor; that afterwards, at the date of the notes, with intent to defraud the defendants answering, and with knowledge of the facts stated, the bank made out, and Lewis signed, the notes set out in the complaint, as the notes of Cook Bros., when in truth the firm had no interest whatever in the consideration of said notes, as the bank well knew.   They further allege settlement and payment by them of all notes and accounts due from the firm to the bank before the commencement of this action; that in the month of ——, 1870, Lewis paid the notes

set out in the complaint to W. S. McCornick, deputy receiver, who, well knowing the facts before stated, and with intent to defraud the defendants answering, as deputy receiver, took back said notes from Lewis, and for the bank claimed and claims to hold the same against Cook Bros.

The evidence shows that Cook Bros. commenced business in Austin in 1864; that Lewis was admitted into the firm as a partner in July, 1866, from which time until May, 1870, the firm carried on the business of general merchandising; that John A. and Isaac were generally absent from the state, and Lewis was the resident managing partner. The First National Bank of Nevada was established in Austin in 1864 or 1865, and subsequently, but before the dates of the notes in question, a branch bank was established in Hamilton. Some time about June 22, 1869, Lewis purchased of W. D. Ivers, above named, a town lot in Hamilton, with a two-story stone storehouse thereon; also, another lot, with building thereon, used as a lodging-house; also, a lot with stone saloon thereon, used as a brewery. The deed conveying the real property was executed in the name of Lewis Cook alone, and the consideration named in the deed was five thousand dollars. At the same time, and probably as a part of the same transaction, he purchased of Bruckman & Ivers a stock of goods consisting of stationery. It does not appear what the exact purchase price of the whole property was, except to the extent of the indebtedness of Bruckman & Ivers, the amount of the larger note (five thousand and eighty-seven dollars and forty-seven cents), and the indebtedness of W. D. Ivers, the amount of the smaller note (one thousand five hundred dollars), for the satisfaction and payment of which the notes in suit were given. The only evidence showing the nature of the transaction, so far as the bank is concerned, outside of the notes themselves, is the testimony of J. W. Harker, who testified as follows:

"I wrote those notes. They were signed by Cook Bros., and delivered to the bank at the time they bear date. I did not know Lewis Cook individually in the matter. The transaction was this: The bank held the notes and

overdrafts of Bruckman & Ivers, and a note of W. D.
Ivers, indorsed by Withington. The notes and overdrafts
of Bruckman & Ivers were the amount of the larger note,
and the note of Ivers was the amount of the smaller note
sued on in this action. In June, 1869, I went to Hamil-
ton to try to settle the matter up. I met Lewis Cook at
Hamilton. He told me that Cook Bros had started busi-
ness in Hamilton. He made arrangements with, and
bought of, Bruckman & Ivers and W. D. Ivers, a stone store-
house and a lot of merchandise, for Cook Bros., and in pay-
ment of this property gave the notes sued on in this action,
to the bank, and the bank gave up and canceled the notes
and overdrafts of Bruckman & Ivers, and the note of W. D.
Ivers. The consideration for the notes to Cook Bros. was
the stone storehouse and a lot of merchandise that they
received from Bruckman & Ivers."

On cross-examination he said: "Cook Bros. had a lot
of goods in Hamilton, and more on the way from Austin,
when these notes were given.   *   *   *   Cook Bros. did
business with the bank constantly, almost every day.
They drew overdrafts and gave notes. Lewis Cook was in
Hamilton, off and on, about two months. I think Cook
Bros. were about starting business in Hamilton in April,
1869. I will swear that I think they were. The two notes
were a part of the same transaction. They were nego-
tiated at the same time. Bruckman & Ivers and W. D.
Ivers were the parties whose notes were given up. I
knew that Bruckman & Ivers were selling real estate.
Cook Bros. commenced doing business with the bank in
1866, and did business with the bank almost every day, up
to the time these notes were given. The business Cook
Bros. did with the bank was to borrow money on notes and
overdrafts. The bank extended to them the same accom-
modations it did to other merchants in good standing.
The notes were signed by Lewis Cook for Cook Bros. I
knew that they were rich, and I was satisfied. I conducted
the entire transaction on the part of the bank. W. D.
Ivers did not tell me he had sold the property to Lewis
Cook. He told me that he had made arrangements with

him to settle with the bank, but I understood that the trade was made for Cook Bros. I never knew that there was any real estate sold in this transaction except the stone store."

On re-direct examination he stated that "all the time Cook Bros. had been dealing with the bank, Lewis Cook was the managing partner in the firm of Cook Bros. in this state, and transacted all the business of the firm with the bank. He gave the notes of the firm a great many times, and they had always been paid by the firm; and up to the time of the execution and delivery of the notes sued on in this action Cook Bros. paid all the liabilities to the bank incurred by Lewis Cook in the name of the firm."

In rebuttal, the same witness testified that prior to the delivery of these notes he did not know that the real estate was deeded to Lewis Cook.

There is no evidence in the case showing, or tending to show, that Lewis purchased the property mentioned for his own use and benefit, and not for the firm, except that the deed conveying the real estate was taken in the name of Lewis alone, as above stated, and that he took possession of the personal property.

There is no proof that Harker knew or had reason to think the property was purchased for the use and benefit of Lewis and not for the firm, or that the firm did not receive the consideration given for the notes, unless it be true that the purchase of the store and the goods was so entirely outside of the scope of the partnership business of the firm, that he was thereby bound in law to know the fact that Lewis had authority from his partners before receiving the notes, and, failing to do so, that the law holds him and the bank guilty with Lewis of constructive fraud.

There is no testimony tending to show actual fraud on the part of Harker, nor is such fraud claimed by counsel for defendants. Nor is there any proof that, as between the partners themselves, Lewis did in fact exceed his authority in purchasing the property; or that Harker knew, or had any notice, that the deed was taken in the name of Lewis; or that the goods were stored in his name, either before or after the delivery of the notes, if such was the case.

Ballenberg testified that in the last part of June, 1869, certain goods, principally stationery, were stored in Ottenheimer's warehouse in Hamilton, in the name of Lewis Cook, as the books showed. He was not sure whether they were withdrawn by Lewis or by Cook Bros. It was not shown that the stationery so stored was that which was bought of Bruckman & Ivers, but we shall treat it as the same, and consequently that Lewis took possession of the goods.

What Harker did know, or had reason to know, in relation to the transaction between Lewis and Bruckman & Ivers and W. D. Ivers, at the time he received the notes, and, as he states, after Lewis had told him that Cook Bros. had started business in Hamilton, is that Lewis had bought the stone store and merchandise—the stationery—for Cook Bros. So far as is shown, that was the limit of his information.

Plaintiff offered to prove, as we shall see, what became of the goods, and by whom the store was occupied after its purchase, but such proof was rejected.

Counsel for defendants states his theory of this case as follows: "Upon these pleadings, what issues are made? We urged that these notes were given for Lewis Cook's individual indebtedness. To prove that, we show all the real estate to have been taken in his name, and the personal property in his possession. We claim, also, a fraud upon the part of Lewis Cook and the bank, upon John A. and Isaac Cook. To prove this we show, and the plaintiff also proved, that this transaction was outside of the legitimate business of Cook Bros., and that the bank had actual knowledge. Next, Lewis Cook, as a partner, being only the agent of the firm, within the legitimate scope of the firm's business, that, as in all other cases of agency, the person dealing with such agent must, at his peril, know his authority; that taking firm notes from one partner in a transaction outside of the partnership business is a fraud upon the other partner." Briefly stated, then, the position of counsel for defendants is this: Lewis gave the firm notes, as he had the authority to do, if the transaction—the purchase—was within the scope of the partnership business. But, says

counsel, in this case, the transaction must be considered as having been made for the individual use and benefit of Lewis, and not for the firm, because the deed was taken in his name, and the personal property was taken possession of by him; and the bank having had notiçe of the above facts (for the reason that the purchase was outside of the scope of the partnership business, of which fact the bank had actual knowledge), therefore, the taking of the firm notes was a fraud upon the other partners, and the bank was, constructively, a party to the fraud, and plaintiff can not recover.

We shall examine these two propositions in the order stated.

This case must be considered as though it had been admitted that Lewis commenced business for the firm, in Hamilton, by and with the previous consent of the other partners. If the latter had not consented to the opening of their house, at the time the notes were given, they certainly did consent within a few days thereafter. So far as the record shows, and from their own testimony, after July 1, 1869, and after they knew that Lewis had commenced business in the firm name, their acts were a constant acknowledgment and proclaiming to the world that Cook Bros. had opened a store in Hamilton. Nor does it matter if, at the dates of the notes, the store had not been actually opened. It is true that, in a proceeding outside of the scope of the business, John A. and Isaac cannot be held to have ratified the unauthorized acts of Lewis, without proof that they knew all the material facts at the time; but here the material fact was that the business which had been carried on by the firm in Austin, and was afterwards conducted in Hamilton in the firm name, had been established by Lewis at the last-named place, or was about to be established, at the time the notes were given. That fact they knew as early as July first, and by ratifying the establishment of their business, the firm thereby became liable for all acts of Lewis properly within the scope of the business so established. (*Burnley* v. *Rice*, 18 Tex. 495.) The case is the same as though Lewis had gone to Hamilton by and

with the knowledge and consent of his partners, with power to open a store and carry on their business at that place. "Such adoptive authority relates back to the time of the original transaction, and is deemed, in law, the same to all purposes as if it had been given before." *The London Savings Fund Society* v. *The Hagerstown Savings Bank*, 36 Pa. St. 503.)

The notes having been given in the firm name, the legal presumption is, that they were executed for a partnership purpose, and that the firm is bound by them, and the burden of proof is upon defendants to establish the contrary. ( 1 Pars. Notes and Bills, 128; *Carrier* v. *Cameron*, 31 Mich. 377; *Gansevoort* v. *Williams*, 14 Wend. 138; *Whitaker* v. *Brown*, 16 Wend. 511; *National Union Bank etc.* v. *Landon*, 66 Barb. 190; *Burgess* v. *Northern Bank of Kentucky*, 4 Bush, 600; *Hamilton* v. *Summers*, 12 B. Mon. Law and Eq. 11.)

When it appears upon the face of a bill or note that it is given in discharge of a separate debt, or in a transaction unconnected with the partnership business, or if it is admitted by the holder that such was the nature of the transaction and he knew it at the time it was taken, then in order to recover against the firm he must show facts other than that it is partnership paper. He must then show the consent of the other partners. But in other cases the burden is upon the defendant to remove the presumption above stated, as well as the additional fact that the holder knew the money was borrowed for the individual use of the partner borrowing, or in a transaction unconnected with the business of the partnership. ( *Whitaker* v. *Brown, supra*, 511; *Gansevoort* v. *Williams, supra*, 138.)

It is said by counsel for defendants, however, that the evidence of both parties removes these presumptions, inasmuch as it shows that the purchase was not within the scope of the partnership, and that Harker had knowledge of that fact; that the burden was therefore upon plaintiff to prove the consent of John A. and Isaac, which he has failed to do. For the purposes of the argument, we shall concede, without deciding the question, that Harker was bound to know that the purchase was without the scope of the busi-

ness of the firm, if so it was; and for the same purpose, without deciding it, that plaintiff's rights are the same as they would have been if the bank had sold the store and goods to Lewis and taken the notes in question therefor, the latter having had authority to commence and carry on the business of general merchandising in Hamilton. We shall not consider the fact that Lewis purchased any real estate besides the store, · because there is no proof that Harker knew or had reason to think that the balance described in the deed was included in the purchase. (*Knapp* v. *McBride*, 7 Ala. N. S. 26, 27, 28, and the two cases last cited.)

Do the facts, then, that the deed to the store was taken in the name of Lewis Cook, and the possession of the goods taken by him after purchase, prove *per se* that the purchase was made for his use and benefit alone, and not for the firm, and consequently that the firm notes were executed for his separate indebtedness? Whether Lewis made the purchase on his own account or for the firm; whether the property was appropriated to the use of Lewis or to the firm, and whether Harker or the bank had knowledge that the transaction was for the benefit of Lewis alone, were undoubtedly questions for the jury to consider. (*Woodward* v. *Winship*, 12 Pick. 433; *Goodman* v. *Simonds*, 20 How. U. S. 343; *Lea* v. *Guice*, 13 Smedes and M. 671; *Judson* v. *Gibbons*, 5 Wend. 224.) But it was necessary that they should decide such questions, like all others, under proper instructions and upon proper evidence; and it may be added that it was a matter of no consequence to prove that the purchase was made by Lewis for his use and benefit, without further proof that Harker or the bank had knowledge of that fact, or of circumstances sufficient to put the bank upon inquiry. Several assignments of error may be considered in this connection.

The jury were instructed as follows at the request of the defendants: "Possession of personal property is *prima facie* evidence of ownership, and a deed on its face imports verity, and no subsequent change of possession shows, or tends to show, that a party in possession first,

was not the owner at that time;" and the court refused to permit plaintiff to prove that about the time the notes were given, Cook Bros. opened a store in Hamilton, in the stone building bought of Ivers, which was a part of the consideration of the notes, and continued to transact business in said building under the firm name until May, 1870; that the stationery purchased of Bruckman & Ivers went into the firm's stock of general merchandise when they opened their said store; that they there dealt in stationery; all of which was done with the knowledge and consent of the defendants John A. and Isaac; and that for a large portion of the time John A. was present, assisting Lewis in conducting and controlling the business of the firm. It is claimed by counsel for defendants, that the instruction above quoted is sound law in this case, and therefore that the rejected evidence was immaterial; also, that it was not legitimate rebuttal. We think counsel is in error. At the trial plaintiff first introduced the notes in evidence, which established a *prima facie* case against defendants, and in addition proved by Harker what the consideration was, what Lewis told witness about Cook Bros. having commenced business in Hamilton, and that the giving of the notes was a transaction of the firm, so far as he was concerned, and not an individual affair of Lewis. On cross-examination witness stated that Ivers did not tell him that he had sold the property to Lewis, but did tell him that he had made arrangements with Lewis to settle with the bank, and that witness understood the trade was made for Cook Bros. When plaintiff rested, defendants introduced the deed from Ivers to Lewis, and evidence tending to show that Lewis took possession of the personal property purchased, and that he stored it in his own name, for the purpose of proving that the property was sold to Lewis and not to the firm. Plaintiff then endeavored in rebuttal to prove the facts above stated, which were rejected. In opening his case, plaintiff did not show that the purchase was made by Lewis for his individual use and benefit. All that was said by Harker touching that point was stated in cross-examination, and that was merely the understanding of

the witness.   He testified to no fact upon which his under-
standing was based, tending to show that such was the na-
ture of the purchase.    The deed, unexplained, did tend to
show what defendants claimed for it, and plaintiff had the
right to prove facts in rebuttal of the ostensible object and
effect of the deed.   He had a right to show that although
the deed was taken in the name of Lewis, still he held the legal
title for the firm, and took possession of the personal prop-
erty for the firm, just as in proper cases it may be shown that
a deed, absolute upon its face, was, and is, in fact, a mort-
gage.   But counsel says:   "The title to all the real estate
was shown to have been in the name of Lewis, and the pos-
session of the goods in him.   Apply the rule of law in this
instruction, quoted above, and what became of the goods
or who occupied these premises becomes entirely imma-
terial."

The court evidently took the same view.

Under the facts and pleadings of this case the instruction
in question was not law.    Let it be borne in mind that one
of the principal issues made was, that Lewis bought the
property for his individual use and benefit and not for the
firm.    If that fact had been admitted by the plaintiff, the
instruction would have been correct.    But we must remem-
ber that plaintiff contended that the purchase was made
for the firm.

It is said in Pars. on Merc. Law, 180:   "If goods are
bought by one partner, and they are immediately used as
the property of the firm, there would be a presumption that
they were bought by him as a partner and for the firm."
(See also Lindley on Partnership, 268.)   Here the offered
proof would have brought the case fully within the doctrine
laid down above.   It was a circumstance for the jury to
consider in deciding one of the main questions made by
defendants, and in deciding that, they should have been
permitted to say why Lewis put the goods purchased with
the general merchandise of the firm, and sold them as a
part of the firm stock, if such were the facts, with the
knowledge and consent of his partners.   The jury should
have said whether or not such acts on the part of all the

partners were consistent with the idea that Lewis purchased the goods for himself, and that the firm so regarded the purchase. (See *Bracken* v. *March*, 4 Mo. 76; Lindley on Part. 268.)

What has been said in relation to the goods is equally true of the store. If that was used for the business of the firm from July, 1869, until May, 1870, with the knowledge and consent of all the members of the firm, that fact, too, was a matter for the consideration of the jury. They might have considered it a circumstance of great significance, particularly in the absence of any evidence that the firm paid Lewis rent for its use, and that the goods and store were not treated as firm property at the time of dissolution. (*Reynolds* v. *Swain*, 7 La. (N. S.) 127; *Dewey* v. *Dewey*, 35 Vt. 556.)

If Lewis had paid out the firm's money for the property instead of giving its notes, taken possession of the goods and received the deed in his own name, I presume, in a contest between his creditors and the creditors of the firm, it would not have been claimed that an appropriation of the property to the use and benefit of the firm was not an important fact to be considered by the jury in determining for whom the purchase was made. The rejected evidence was equally important in this case.

Besides, if Lewis had authority to purchase the goods and thereby bind the firm, and did purchase them for the partnership, possession by him was possession by all. And if the purchase of the store was within the scope of the partnership business, and was in fact purchased for the firm and appropriated to its uses, it was a matter of no moment that the deed was taken in the name of Lewis alone. (Pars. on Part. 364 *et seq.*; *Hunt* v. *Benson*, 2 Humph. 460; *Hoxie* v. *Carr*, 1 Sumner, 180; *Dyer* v. *Clark*, 5 Met. 581; *Moderwell* v. *Mullison*, 21 Pa. St. 259; *Hogle* v. *Lowe*, 12 Nev. 295.)

The court erred in giving the instruction just considered, and in rejecting the offered evidence.

But it is urged that the purchase of both the store and the goods was beyond the scope of the partnership busi-

ness, and, consequently, that Lewis had no implied authority to bind his partners thereby; that knowledge of such purchase was sufficient to put Harker upon inquiry as to the actual authority of Lewis, and that failing to prove authority outside and beyond the fact that, as partner, he made the purchase and gave the partnership notes in payment, plaintiff cannot recover. The most important questions in the case are here presented: Are the undisputed facts legally sufficient to sustain the position of counsel and support the verdict in this respect? In the consideration of these questions, we must again keep in mind, first, that the business of the partnership was general merchandising; and, second, that even though it be true that Lewis had not the implied authority or the express consent of his partners to open business in Hamilton, still by their subsequent conduct, after they knew he had done so, they ratified the acts of Lewis in so doing, and in relation to the questions under discussion, the case stands the same as though the latter had commenced business there, by and with the previous consent of his partners.

The purchase of real property may or may not be within the scope of partnership business. If it is, one partner can buy it, if the purchase be made actually or ostensibly for the partnership, and thereby bind the firm—the vendor acting in good faith—just as he can purchase personal property under similar circumstances. No rule of law prohibits a partner from purchasing either, if such purchase is fairly within the scope of the business. Each gives the other, when the partnership is formed, an implied authority to enter into any contract within the scope of the business. If a partnership is formed for the sole purpose of dealing in lands, either may purchase them for the firm, and thereby bind his partners; but he would have no right, by reason of the partnership relation, to buy personal property, unless it be for the proper management, and in aid, of the partnership business.

If the business of a partnership is buying and slaughtering cattle, the managing partner can not, in consequence of the partnership alone, bind the firm by the purchase of a

store, a saloon or a theater, for speculative purposes; but he can buy either for the firm, if he makes the purchase for a slaughter-house, and the vendor acts in good faith, believing from representations of the purchasing partner that it is bought for the business of the firm.

Two men in Carson form a partnership for the purpose of keeping a hotel in Eureka. They agree that each may give the notes of the firm, draw bills of exchange and checks, if he deems proper, in all matters within the scope of the partnership business, thus giving one another the same power that defendant had without such agreement. One goes there as the managing partner. He finds a building that is a fit place for the business. He can hire at a high rent, or purchase at a low figure, and he buys instead of hiring. He can not run the hotel without supplies, and therefore buys them at a neighboring store. He then goes to one bank and tells the cashier that the firm has bought the hotel and intends to keep it; that they wish to borrow a stated sum of money to be used in payment. The money is loaned on six months' time, and the firm note given. He then goes to another bank and informs the cashier that he wishes to borrow money to pay for supplies bought for the firm. That money is loaned on the same time, and the firm note given. Can it be said that the purchase of the house for a hotel was outside of the scope of the partnership business, while buying supplies was within it, and that knowledge of the purchase by the first cashier would defeat an action upon the note received by him, while upon the second the firm is bound?

In my opinion the buying of supplies was not more within the scope of the business than the purchase of the hotel. Both were required, and both appertained to hotel-keeping only.

Two men as partners established a stage line between Carson and Bodie. One, the active, managing partner, buys stock, grain, coaches and hay. For those articles he can undoubtedly bind the firm, whether he makes judicious bargains or not. But it is necessary to purchase, build or hire barns. In one place he builds, in another hires, in

another buys on credit. All those acts are entirely within the scope of the partnership, and one as much as the others. In the case last supposed, if both partners had been present, they might have concluded to accomplish the same end by different means; where one built, both might have deemed it expedient to hire, but had they done so, the acts of both would not have been more within the scope of the partnership than was the act of one. Any act which would have been within the scope of the business, if both had acted in concert, is equally so if it is done by one. In this case, if all the defendants had been present, and had purchased the store for speculative purposes, it would have been outside of the business of general merchandising. So it would have been had Lewis bought it for that purpose. So it was if he did purchase it for that purpose; and had Harker known that such was the object of the purchase, instead of having good reason to think—if his own testimony is true—that the firm had started business in Hamilton, and needed the store for their legitimate purposes, a different case would have been presented.

*Brooke* v. *Washington*, 8 Grattan, 250, is an interesting case in this connection.

Perdue, Nichols, Brooke and Jewell entered into partnership for carrying on the business of iron-making in Jefferson county, and accordingly carried it on for about two years. Perdue and Nichols resided in the county, and were the ostensible partners, while Brooke and Jewell were non-residents of the state. The firm name was "Perdue, Nichols & Company." The respondent, Washington, sold and conveyed to Perdue and Nichols eight hundred and forty-three acres of land in Jefferson county, for six thousand two hundred dollars, of which one thousand one hundred dollars were paid at the time, and for the balance they gave their bonds and a deed of trust on the land, to secure payment. The cash payment was made by the check of Perdue, Nichols & Co., and entries were made on their books crediting Washington in account with the firm for six thousand two hundred dollars, the purchase money of the land, and debiting him with one thousand one hundred

dollars, the cash payment.   During the operations of the partnership for some eighteen months after the purchase, five thousand cords of wood were cut from the land and used in the firm business.   Rents for a portion of the land were received by the firm and entered on their books.   It was not generally known that Brooke and Jewell were partners, nor did Washington know it at the time of the sale of the land.   Brooke had access to the books, but it did not appear that he examined any account but his own.   The firm became insolvent, and Washington brought suit and endeavored to charge the balance due upon the individual partners, the land having become comparatively valueless by reason of the destruction of timber and trees thereon. Brooke alone filed an answer and placed his defense principally upon the ground that the purchase was not made on account, or upon the credit, of the firm, or by his authority, and was not within the scope of the partnership.

We quote briefly from the court's opinion:   "The purchase was within the scope of the partnership, for the operations of the furnace could not be carried on without fuel; and the best mode of obtaining it was to purchase land in the neighborhood, well covered with wood, as was the land of Washington.   All the partners are therefore bound for the purchase money on the authority of the cases before cited."   (See, also, *Weaver* v. *Tapscott*, 9 Leigh, 424; *Burnley* v. *Rice*, 18 Tex. 494.)

In Schouler's Pers. Prop. the author says, on page 225: "It was formerly deemed that partners could not, as such, own real estate, nor, indeed, transact business in lands at all.   But the law in this respect has changed with the wants of trade.   Not only does a partnership find real estate suitable for the purposes of investment, but lands and buildings are frequently desired for stores, warehouses and factories in connection with the partnership pursuits.   *   *   *   The American rule, as now established, is that real estate purchased and held as partnership property is so treated in equity and subjected to all the partnership incidents." (See *Lacy* v. *Hall*, 37 Pa. St. 360; *Erwin's Appeal*, 39 Pa. St. 537.)   And admitting that Harker was bound to know

that the purchase was within the partnership business, then, as regards the goods, it must appear that the purchase of stationery was within the scope of the business of general merchandising. He was not bound to know that defendants had never, in fact, dealt in stationery. If buying and selling stationery was within the scope of the partnership as much as dealing in provisions, groceries and clothing, then Lewis had power to purchase it and bind the firm by his act. Had defendants' business been dealing in hardware only, either could have bound the partnership in the purchase of any article that could be considered as legitimately belonging to that line of trade. They may have never dealt in stoves, yet stoves are hardware, and the seller need not have stopped to inquire whether or not the firm had ever dealt in them before. So it is in this case, if buying and selling stationery is within the scope of general merchandising. There is no kind of business that permits within its legitimate scope a more extended dealing than the one under consideration. Why it does not, or should not, include stationery, if that article is in demand at the place of business, as well as groceries, clothing, dry goods, etc., counsel for defendants has not informed us, and the books certainly do not so teach. (See Bouv. Dict., tit. "Merchandise." *Citizens' Bank* v. *Nantucket Steamboat Co.*, 2 Story's R. 51.)

If Lewis had bought stationery in San Francisco under the same circumstances, we hardly think defendants would have claimed that he acted beyond the scope of the partnership. If the partnership had been formed for the purpose of carrying general merchandise from the railroad to Hamilton, in an action to recover the value of stationery lost or destroyed, we venture the opinion that the defendants would not have urged, in defense, the proposition so persistently argued here, that stationery cannot properly be classed with general merchandise. In his work on Part. page 201 (6th ed.), Mr. Story says : "If persons are engaged in the more business of tallow chandlers, as partners, a purchase of a cargo of flour, or of pepper, or of coffee, or of other things, by one partner, wholly beside the business of the

firm, would not bind the other partners. But if the articles were such as might be applied or called for in the ordinary course of their business, the purchase of such articles would bind the firm, even though they were unnecessary at the time, or were bought contrary to the private stipulations between the partners, or were not designed to be used in the partnership at all, if the vendor were not acquainted with the facts." (See also *Livingston* v. *Roosevelt*, opinion of Kent, Ch. J., 1 Am. Lead. Cas. 427; *Winship* v. *Bank U. S.*, 5 Pet. 560; Bateman¹ on Commercial Law, 587, 595, 596, 601; Collier on Part. 484; Smith's Merc. Law, 76; Gow on Part. 53, 56, 61, 68; *Bond* v. *Gibson*, 1 Camp. 184; *Freeman* v. *Carpenter*, 17 Wisc. 137; *Walden* v. *Sherburne*, 15 Johns. 422; *Woodward* v. *Winship*, 12 Pick. 433; *Chemung Canal Bank* v. *Bradner*, 44 N. Y. 688; *Beckham* v. *Drake*, 9 M. & W. 92, *et. seq.*)

None of the authorities cited by counsel for defendants are opposed to our conclusions. Our opinion is, that under the undisputed facts, Lewis acted within the scope of the partnership business in purchasing the stationery and the store, and that the knowledge of such purchase was not sufficient to put Harker upon inquiry as to the consent of the other partners.

A few additional assignments of error will be noticed briefly: If we are correct in the conclusion before stated in relation to the effect of the acts of John A. and Isaac, subsequent to July 1, 1869, the question embodied in the fifth assignment was at least immaterial, and the objection should have been sustained.

The question referred to in the ninth assignment assumed as a fact, that John A. had settled the indebtedness of Cook Bros., when there was no proof of the same. That might have influenced the jury, and it should not have been asked in that form. (*Boyd* v. *McCann*, 10 Md. 118.)

Plaintiff should have been permitted to ask witness Hilp, on cross-examination, when Cook Bros. commenced business in Hamilton. He had, in chief, testified directly upon that point.

Nothing additional need be said concerning instruc-

tions seven and nine, asked by plaintiff, or instruction two, given at request of defendants.

The order overruling plaintiff's motion for a new trial is reversed.

HAWLEY, J., having been of counsel at a former trial of this cause, did not participate in the foregoing decision.